G. HEILEMAN BREWING COMPANY, INC., and Miller Brewing Company, Plaintiffs–Appellees, Cross–Appellants,

v.

ANHEUSER–BUSCH, INC., Defendant–Appellant, Cross–Appellee.

Nos. 88–1223, 88–1309 and 88–1310.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 30, 1988.
Decided April 26, 1989.

Robert M. Newbury, Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, Chicago, Ill., for defendant-appellant, cross-appellee.

David E. Beckwith, Foley & Lardner, Laurence C. Hammond, Jr., Quarles & Brady, Milwaukee, Wis., for plaintiffs-appellees, cross-appellants.

Before CUDAHY and KANNE, Circuit Judges, and WILL, Senior District Judge.*

CUDAHY, Circuit Judge.

Defendant-appellant Anheuser–Busch, Incorporated ("Busch") appeals a judgment declaring that "LA" is not a protectible trademark for a low alcohol beer introduced by Busch in 1984. The district court found that the initials LA are merely descriptive of low alcohol beer and have not acquired secondary meaning. Accordingly, the district court concluded that the use of LA (or "L.A.") by G. Heileman Brewing Company ("Heileman") and Miller Brewing Company ("Miller") on their own low alcohol beer labels does not constitute trademark infringement or unfair competition. Heileman and Miller cross-appeal the district court's denial of their requests for permanent injunctive relief and for a declaratory judgment that LA is generic. We affirm.

---

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. Prior to April 27, 1984, BATF prohibited beer labeling or advertising that described a product as having a low or reduced alcohol content. Although many states adopted these regulations, some did not. Consequently, in 1983, the Hudepohl Brewery was permitted to market reduced alcohol beer under the "PACE" trademark in Ohio and the Christian Schmidt Brewing Company marketed a reduced alcohol beer under the "BREAK" trademark in Pennsylvania. Both

## I.

While traveling in Australia in 1981, August A. Busch III, the president and chief executive officer of Anheuser–Busch, studied the production and marketing of low alcohol beer, a product that has experienced immense popularity in that country since its introduction in 1979. In Australia, the name "LA" has gained widespread recognition as signifying low or light alcohol beer on labels such as Tooth LA, South Australian LA, Courage LA, and Carling LA. *G. Heileman Brewing Co. v. Anheuser–Busch, Inc.*, 676 F.Supp. 1436, 1453 (E.D.Wis.1987) (*"Heileman"*). After returning to the United States, Mr. Busch directed his company to commence research and development of a low alcohol beer. Internal memoranda during this early planning phase reveal that Anheuser–Busch aspired to preempt the low alcohol beer market and emulate the success enjoyed previously by Miller in capturing the low calorie beer segment with its "LITE" beer. Anheuser–Busch envisaged a new low alcohol product that would appeal to current lifestyle trends, which emphasize physical fitness and moderate drinking habits. *See* Answer and Counterclaim of Anheuser–Busch, No. 84 C 0738, at 3. On November 21, 1983, Busch obtained approval from the Bureau of Alcohol, Tobacco and Firearms ("BATF") for beer labels using the designation LA. At that time, BATF regulations prohibited references to reduced alcohol content on beer labels; thus, Busch could not include the terms "low alcohol" on its LA label but presumably viewed the initials LA as an effective subterfuge.[1]

---

beers included "reduced alcohol" descriptions on their labels and in their advertising. Other than these two relatively small companies, no brewers in the United States were marketing low alcohol beer prior to December of 1983. *Heileman*, 676 F.Supp. at 1453.

As of April 27, 1984, however, the BATF altered its interpretation of the regulations to permit labeling and advertising of low or reduced alcohol content in malt beverage products containing less than 2.5 percent alcohol. Trial Exhibits 63, 762; *Heileman*, 676 F.Supp. at 1461.

In an effort to select a brand name that could become the "bar call of the 80's," Busch retained the Interbrand Corporation to develop and test potential names for its new low alcohol beer. After researching the subject, Interbrand advised Busch that using "LA" as a stand-alone brand name "would not, in all likelihood, be protectible since it clearly and obviously stands for low alcohol, and as such is clearly an abbreviation of the generic descriptor." Trial Exhibit 12. Interbrand also warned Busch that low alcohol or LA would probably be referred to as a category descriptor for all low alcohol beers, including those produced by other brewing companies, thereby presenting a significant potential for confusion. *Id.* Therefore, Interbrand recommended a corporate source approach employing the name "LA from Anheuser–Busch," which Busch ultimately adopted.

On January 20, 1984, Anheuser–Busch issued a press release announcing its new product and informing the industry and the public that "LA from Anheuser–Busch" was a "light alcohol product." Trial Exhibit 22. In its efforts to develop an effective marketing strategy, Busch proceeded warily in pursuit of its dual objectives: to use LA as an arbitrary or suggestive term in order to attain trademark protection and, concurrently, to describe the unique low alcohol quality of its new beer to consumers without violating regulations that proscribed the advertising of reduced alcohol content. Busch orchestrated a publicity campaign in which it tacitly encouraged public relations and advertising agencies, as well as media representatives, to describe LA to consumers as low, less or light in alcohol.[2] *Heileman,* 676 F.Supp. at 1459. The district court found that, although Anheuser–Busch personnel equated LA with low alcohol in communications within the company and in advertising and point-of-sale materials, Busch subsequently sought to disclaim the initialism in various

ways. For example, it deleted the periods from the letters; it claimed that the letters had no meaning; it modified its advertising message from "low alcohol" to "half the alcohol" and promoted the phrase "reduced alcohol" as the category descriptor for the new beer. *Id.* at 1458.

Meanwhile, the concept of low alcohol beer had been fermenting elsewhere in the beer industry. On March 7, 1984, the Stroh Brewery Company obtained BATF approval for two beer labels: SCHAEFER LA and OLD MILWAUKEE LA. Despite objections from Busch, Stroh then issued a press release announcing its plans to market SCHAEFER LA. Likewise, Heileman had been developing its own version of low alcohol beer since early 1982. Apprised of Busch's new LA product, of Stroh's announced plans to market SCHAEFER LA and of the BATF approval of both brewers' beer labels, Heileman announced on March 29, 1984, its plans to market low alcohol beer under labels containing its own house marks with "L.A." as a category descriptor —for example, CARLING BLACK LABEL L.A. and BLATZ L.A. *Heileman,* 676 F.Supp. at 1452. Miller was also on the LA campaign trail. In March of 1984, Miller began developing a low alcohol beer and sent its brand manager to Australia to study the established low alcohol beer market there. After consulting its retained advertising agency, Miller ultimately adopted "SHARP'S LA" as its brand name.

On March 16, 1984, Anheuser–Busch became the first user of the LA label in commerce by sending shipments of low alcohol beer to its wholesalers. After learning of Heileman's plans to begin using the LA label, Anheuser–Busch sent a cease and desist letter to Heileman, dated April 2, 1984, claiming exclusive trademark rights in the initials LA. Heileman responded on April 18 by filing this action to protect its right to use "L.A." with a Heileman house mark on its own low alcohol beer.[3] The

---

**2.** By the time of trial, Anheuser–Busch had spent approximately $27,000,000 advertising its LA beer.

**3.** Hours after Heileman filed this action in the Eastern District of Wisconsin, Anheuser–Busch

filed a mirror-image lawsuit against Heileman in the Southern District of Illinois. The district court in Wisconsin granted Heileman's motion to enjoin the latter proceedings pending final judgment and appeal in this action.

following day, Heileman commenced use of the "L.A." mark in commerce. Thereafter, on June 4, 1984, Miller filed a parallel action against Busch which was eventually consolidated with Heileman's case. Busch filed counterclaims against both brewing companies alleging trademark infringement, unfair competition and trademark dilution. Meanwhile, on May 23, 1984, the United States Patent and Trademark Office had rejected Busch's applications to register "L.A." and "LA" on the ground that the initials designated "Los Angeles." *Heileman*, 676 F.Supp. at 1458.

In its complaint, Heileman seeks a declaratory judgment that LA is descriptive and generic and that, therefore, its use does not constitute trademark infringement or unfair competition. In addition, Heileman requests injunctive relief permanently enjoining Busch from interfering or threatening to interfere with Heileman's use of the term "LA" to denominate low alcohol beer. Miller's complaint requests similar relief.[4]

Two months after filing its complaint, on August 13, 1984, Miller actually began employing the SHARP'S LA label on beer shipped in commerce. By the time of the consolidated trial, which commenced on September 24, Miller had been selling SHARP'S LA at retail outlets in five test markets.

Three years after the nine-day trial, on December 31, 1987, the district court issued its decision, finding that Busch had been the first or senior user of the LA mark; that the initials LA were merely descriptive as applied to low alcohol beer; that Anheuser–Busch failed to establish secondary meaning with respect to the initialism; and that the use of LA by Heileman and Miller in connection with strong house marks or brand names was not likely to cause confusion as to the source of the beer products.

Accordingly, the district court entered a judgment in favor of Heileman and Miller on the trademark declaratory judgment claims, but denied Heileman and Miller any injunctive relief because the court "would not expect that Anheuser–Busch will continue to interfere with the use of the 'LA' name for low alcohol beer by Heileman and Miller." *Heileman*, 676 F.Supp. at 1500.

Busch has appealed from the district court's denial of its claims of trademark infringement and unfair competition. In addition, Busch claims that the district court erred in failing to dismiss Miller's complaint for lack of subject matter jurisdiction. Heileman and Miller have cross-appealed from the court's denial of their requests for a permanent injunction prohibiting Busch from continuing to interfere with their use of LA in the future and for a declaratory judgment that LA is generic.

## II.

As a preliminary matter we must determine whether the district court properly exercised subject matter jurisdiction over Miller's claims. Busch asserts that Miller's complaint seeking declaratory relief did not present a ripe justiciable controversy at the time it was filed and that, therefore, the district court lacked jurisdiction over Miller's claims.

As we stated in *Tempco Electric Heater Corp. v. Omega Engineering, Inc.*, 819 F.2d 746 (7th Cir.1987):

A declaratory judgment is available where a party desires a declaration of the legal effect of a proposed or past course of action. Essentially, two related but distinct fact situations are contemplated: (1) The controversy has ripened to a point where one of the parties could invoke a coercive remedy (i.e. a suit for

---

**4.** Specifically, Heileman's complaint alleges four causes of action against Anheuser–Busch: count I seeks injunctive relief and a declaratory judgment of noninfringement under the trademark laws; count II seeks injunctive relief and a declaratory judgment that Heileman is not unfairly competing with Anheuser–Busch under federal law, Wisconsin statutory law or the common law; count III seeks damages, claiming that Anheuser–Busch is engaging in unfair competition under 15 U.S.C. section 1125(a) and the common law; and count IV seeks treble damages, claiming that Anheuser–Busch is attempting to monopolize the low alcohol beer market in the United States in violation of 15 U.S.C. section 2. *Heileman*, 676 F.Supp. at 1448–49.

damages or an injunction) but has not done so; and (2) Although the controversy is real and immediate, it has not ripened to such a point, and it would be unfair or inefficient to require the parties to wait for a decision.

*Id.* at 749 (footnote omitted). We think the present case is, at the very least, encompassed by the latter factual paradigm (with a slight twist since Busch, apparently presuming a ripe controversy, counterclaimed against Miller seeking a coercive remedy).

In *International Harvester Co. v. Deere & Co.*, 623 F.2d 1207 (7th Cir.1980), we held that there are two prerequisites for establishing an actual controversy in a patent infringement declaratory judgment action. First, the defendant must have engaged in conduct creating a reasonable apprehension that the plaintiff will face an infringement suit or the threat of one if it commences or continues the questionable activity. Second, the plaintiff must have produced the accused article or have engaged in preparations such that, but for a finding that the product infringes or for extraordinary and unforeseen contingencies, the plaintiff would and could begin production immediately. *Id.* at 1210 (citations omitted). In connection with this latter element, the plaintiff must possess the "apparent ability and definite intention ... to manufacture and sell a product similar to ... defendant's...." *Id.* at 1215 (citation omitted). Whether a justiciable controversy exists is measured by examining the state of affairs at the time the complaint is filed. *Id.*

■ Reasonable apprehension exists when there is "an implied charge, or a course of conduct on the part of the defendant which would cause a reasonable man to fear that he or his customers face an infringement suit or threat of one." *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783–84 (7th Cir.1979). A reasonable apprehension of an infringement suit may be based upon the defendant's assertion of exclusive rights against another party. *See Interdynamics, Inc. v. Firma Wolf*, 698 F.2d 157, 168 n. 12 (3rd Cir.1982); *Smith–Corona Marchant, Inc. v. American Photocopy Equip. Co.*, 214 F.Supp. 348, 352 (S.D.N.Y.1962); 6A J. Moore, *Moore's Federal Practice* ¶ 57.20, at 57–225 (2d ed.1987) (citing *Dewey & Almy Chemical Co. v. American Anode, Inc.*, 137 F.2d 68 (3rd Cir.), *cert. denied*, 320 U.S. 761, 64 S.Ct. 70, 88 L.Ed. 454 (1943)).

■ The undisputed facts establish that Miller possessed a reasonable apprehension of encountering an infringement action or threat of one at the time the complaint was filed. Busch had commenced an action on April 18, 1984, against the Stroh Brewery in the Eastern District of Missouri in response to Stroh's announcement of its plans to market SCHAEFER LA beer.[5] On the same date, Busch filed an infringement action against Heileman in the Southern District of Illinois. Meanwhile, two hours prior to Busch's filing in Illinois, Heileman had already filed the instant action seeking, *inter alia*, a declaratory judgment against Busch. In the midst of this flurry of litigation, Miller certainly had a reasonable apprehension of confronting an infringement suit if it commenced actual production and sale of its new beer, SHARP'S LA.

We also believe that Miller had engaged in adequate preparations to satisfy the second prong of the *International Harvester* actual controversy test. A declaratory judgment plaintiff "need not have engaged in actual manufacture, use, or sale of a potentially infringing product in order to seek a declaratory judgment of noninfringement...." 623 F.2d at 1215. The plaintiff's interest is sufficiently "real"

where he alleges that he is actively preparing to produce the article in question. This is the last point before the point of no return. Any further action on his

---

**5.** In *Anheuser–Busch, Inc. v. Stroh Brewery Co.*, 587 F.Supp. 330 (E.D.Mo.), *aff'd*, 750 F.2d 631 (8th Cir.1984), Busch filed suit seeking a permanent injunction against Stroh shortly after Stroh had announced in a press release that it planned to market its new "SCHAEFER LA" brand of low alcohol beer. Neither the district court nor the Eighth Circuit discussed the extent of the preparations or the actual infringing conduct engaged in by Stroh in the introduction of its new beer. Apparently, the parties (and the court) assumed that the case presented a justiciable controversy and disregarded the issue of subject matter jurisdiction.

part may well cause him to be liable as an infringer, and the [Declaratory Judgment] Act is designed to prevent the necessity of acting at one's peril. By making active preparations he has shown that he has more than a mere speculative interest in the validity and applicability of the [trademark]. His interest is direct, real, and immediate, not a mere academic one.

6A J. Moore, *Moore's Federal Practice* ¶ 57.20, at 57–217.

Paragraph 10 of Miller's complaint alleges:

Miller will introduce its own low alcohol beer in the immediate future. It will use a distinctive trademark therefor, with the initialism "LA" to identify the beer as one with low alcohol content. In this connection, Miller has already expended many thousands of dollars for product development and the creation of bottle label and can designs and advertising, and is committed to making rapidly increasing expenditures totalling millions of dollars.

Miller's Complaint, No. 84 C 0738, at 3. In addition, testimony adduced at trial revealed that Miller had incurred considerable expenses in developing a market for its low alcohol beer and had sent its new products manager to Australia to study the low alcohol beer market there. After reviewing reports from its new products manager and consulting its retained advertising agency, Leo Burnett, Miller ultimately adopted "SHARP'S LA" as its new brand name. Anticipating opposition from Anheuser–Busch, which had been very vigilant in its endeavor to secure exclusive use of the LA initialism, Miller filed suit for a declaratory judgment to ensure that its use

of the LA label would not violate the trademark laws. After Miller's action was consolidated with the pending Heileman case, Anheuser–Busch, as expected, filed a counterclaim against Miller for trademark infringement. By the time of trial, Miller had been actively selling SHARP'S LA in several test markets.

We believe these facts confirm that Miller's interest at the time the complaint was filed was not merely speculative; rather, Miller evinced a definite intent and apparent ability to commence the use of the LA label. Although the facts existing at the time Miller filed its complaint may not have presented a fully ripe dispute, the circumstances presented a sufficiently "real and immediate" controversy and, hence, we think "it would [have been] unfair or inefficient to require the parties to wait for a decision." *Tempco Electric*, 819 F.2d at 749.[6]

### III.

#### A.

The principal argument raised on appeal by Busch is that the district court misapplied the law in holding that the initials LA are merely descriptive and unprotectible. As we delineated in *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978), a term for which trademark protection is claimed generally fits somewhere in the spectrum of classifications ranging from (1) generic or common descriptive and (2) merely descriptive to (3) suggestive and (4) arbitrary or fanciful.

A generic or common descriptive term is one which is commonly used as the

---

**6.** We realize that the district court's opinion reflects a somewhat different rationale for asserting subject matter jurisdiction over Miller's claims. After reviewing the facts existing when Miller filed its complaint, the district court conceded that Miller's claims were not ripe at that time. Nonetheless, the court noted that Anheuser–Busch did not challenge Miller's standing and that the facts which could have defeated jurisdiction were not revealed until trial. Meanwhile, Busch had filed its counterclaims against Miller for trademark infringement and, by the

time of trial, Miller had commenced selling SHARP'S LA, thereby ripening its claims. Based on these circumstances, the district court concluded that it "would be inefficient to dismiss Miller's declaratory judgment claims at this point, particularly since they did ripen into a justiciable controversy before trial...." *Heileman*, 676 F.Supp. at 1482. We affirm the district court's decision on this issue albeit employing the somewhat different rationale presented in the text.

name or description of a kind of goods. It cannot become a trademark under any circumstances[, e.g., "light beer," "decaffeinated coffee"] . . . .

A merely descriptive term specifically describes a characteristic or ingredient of an article. It can, by acquiring a secondary meaning, *i.e.*, becoming "distinctive of the applicant's goods" (15 U.S.C. § 1052(f)), become a valid trademark[, e.g., "bubbly champagne," "Auto Page"].

A suggestive term suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods. Such a term can be protected without proof of a secondary meaning[, e.g., "Tide," "Coppertone"].

An arbitrary or fanciful term enjoys the same full protection as a suggestive term but is far enough removed from the merely descriptive not to be vulnerable to possible attack as being merely descriptive rather than suggestive[, e.g., "Kodak," "Black & White" scotch].

*Id.* (citations omitted); *see also Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.*, 781 F.2d 604, 609 (7th Cir.1986); *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901 (7th Cir.1983). In *Walt–West Enterprises v. Gannett Co.*, 695 F.2d 1050 (7th Cir.1982), we provided further clarification:

Properly understood, the so-called trademark spectrum reflects levels of judicial skepticism concerning whether the term actually serves the source denoting function which a mark is supposed to perform. Terms which are arbitrary, fanciful, or suggestive as applied to a given product or service are naturally understood by the consuming public as designations of origin: it is unlikely that such terms would be understood as anything else. . . . Descriptive terms, on the other hand, are ill-suited to serve as designations of origin, for such terms are naturally understood by the consuming public in their ordinary descriptive sense.

*Id.* at 1057. Thus, if LA is deemed generic, as Heileman and Miller assert, it is not entitled to trademark protection. Contrariwise, if LA is suggestive, as Busch contends, it is protectible. Finally, if LA is merely descriptive, as the court below determined, it is protectible only upon proof of secondary meaning. In reviewing the decision below, we keep in mind that the district court's classification of a term on the trademark spectrum is a factual determination subject to the "clearly erroneous" standard of review. Accordingly, this determination "may only be set aside if after considering all the evidence we are 'left with the definite and firm conviction that a mistake has been committed.' " *Walt–West Enterprises v. Gannett Co.*, 695 F.2d at 1058 (quoting *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

It is unarguable that the phrase "low alcohol" is descriptive and unamenable to trademark protection. But whether the initials for this descriptive phrase should also be deemed descriptive presents a separate, yet related, issue. The law in this circuit is ostensibly incongruous and thus requires some clarification.

Anheuser–Busch argues that the district court misapplied the legal standard in determining the protectibility of initials and that, therefore, we should review the district court's decision de novo. Specifically, Busch adverts to the district court's observation in footnote 48 to its opinion that "initials are merely short forms of the words for which they stand and should be accorded the same degree of protection as those words." *Heileman*, 676 F.Supp. at 1493 n. 48. This formulation was presumably based on the language in *National Conference of Bar Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 488 (7th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983), that "[a]bbreviations for generic or common de-

scriptive phrases must be treated similarly." In *National Conference,* this court reversed the district court's decision according trademark protection to the phrase "Multistate Bar Examination" and its initials "MBE." We reasoned that

[u]nder settled trademark law if the components of a trade name are common descriptive terms, a combination of such terms retains that quality. We note further that [the fact that] plaintiffs also use the initials "MBE" to designate their test is of no consequence. Abbreviations for generic or common descriptive phrases must be treated similarly.

*Id.* at 488 (citing *FS Services, Inc. v. Custom Farm Services, Inc.,* 471 F.2d 671, 674 (7th Cir.1972)).

Busch argues vigorously against the concept that the initials of descriptive words are inherently descriptive. Instead, Busch contends that the "accepted rule" for determining whether initials are to be treated similarly to the descriptive or generic words that they represent is whether the letters have become generally recognized as descriptive or generic by the general public. According to Busch, *National Conference* misstates the law in this circuit by misreading the principle of *FS Services, Inc. v. Custom Farm Services, Inc.,* 471 F.2d 671 (7th Cir.1972).[7] In *FS Services,* we indeed stated that "abbreviations for generic terms *where they are generally recognized* must be treated similarly." 471 F.2d at 674 (emphasis supplied). There we concluded that the letters "FS have come to signify 'farm service' ... [which] are descriptive or generic terms." *Id.* Busch cites *FS Services* and numerous other authorities as support for the principle that initials for descriptive phrases are not *ipso facto* descriptive; rather, only if initials are generally recognized as signifying the corresponding descriptive phrases are they to be treated similarly for purposes of trademark protection. *See, e.g., Modern*

*Optics v. Univis Lens Co.,* 234 F.2d 504 (C.C.P.A.1956) ("CV," initials for "continuous vision," not *ipso facto* unregisterable; "as a general rule, initials cannot be considered descriptive unless they have become so generally understood as representing descriptive words as to be accepted as substantially synonymous therewith"); *see also Kampgrounds of America, Inc. v. North Delaware A-OK Campground, Inc.,* 415 F.Supp. 1288 (D.Del.1976), *aff'd without opinion,* 556 F.2d 566 (3rd Cir. 1977); *Merritt Forbes & Company Inc. v. Newman Investment Secs., Inc.,* 604 F.Supp. 943, 956 (S.D.N.Y.1985). *But see CPP Ins. Agency, Inc. v. General Motors Corp.,* 212 U.S.P.Q. 257 (C.D.Cal.1980) (concluding that the term "CPP," initials for the descriptive phrase "consumer protection plan," is by its very nature, descriptive).

Of course, we are aware that Busch's point is valid in principle: the ultimate test of descriptiveness is recognition by the consuming public. But this does not mean that the statement of the district court in footnote 48 is incorrect in any fundamental way. It is possible, although not likely, that the public might become acquainted with initials used in connection with a product without ever being aware that the initials were derived from, and stood for, a descriptive phrase or a generic name. This is conceivable, though rather improbable, because the connection between the initials and the descriptive words is in normal course very likely to become known. The process of identifying initials with the set of descriptive words from which they are derived is, after all, usually fairly simple. Ordinarily, no flight of imagination or keen logical insight is required. There is a natural assumption that initials do generally stand for something. All that needs to be done is to convert the next-to-obvious to the obvious by answering the inevitable question: What do the initials stand for?

7. Alternatively, Busch argues that the language in *National Conference* is mere dicta because the holding, in Busch's view, is limited to the conclusion that the phrase "Multistate Bar Examination" is not protectible. To the contrary, the district court in that case held that both "Multi-state Bar Examination" and "MBE" are protected by the trademark laws. On appeal in that case, one of the issues squarely before this court was whether the initials "MBE" were protectible and we specifically held that they were not. *See* 692 F.2d at 488.

*Cf. Anheuser–Busch, Inc. v. Stroh Brewery Co.,* 750 F.2d 631, 648 (8th Cir.1984) (Bright, J., dissenting; noting "penchant of the American public to adopt nicknames and other shortened appellations, including acronyms") (citing *Application of Abcor Development Co.,* 588 F.2d 811, at 815 (C.C.P.A.1978) (Rich, J., concurring); 3 R. Callmann § 18.04).

■ As a rule, no very extensive or complicated process of education or indoctrination is required to convey that initials stand for descriptive words. The relatively straightforward answer to an evident question identifies the initials with the descriptive phrase from which they are derived. By contrast, the process whereby the same initials might acquire a secondary meaning pointing to the source of the product is often lengthy and expensive. As a practical matter, there must be a presumption that initials mean, or will soon come to mean, to the public the descriptive phrase from which they are derived. Although the matter is certainly not foreclosed, there is a heavy burden on a trademark claimant seeking to show an independent meaning of initials apart from the descriptive words which are their source. The imposition of such a burden is consistent with the policy of the trademark laws to guard against unjustified appropriation from the public domain of terms needed to perform a descriptive function.[8] Such a burden is also consonant with the general rule that the claimant of trademark law protection bears the burden of establishing by a preponderance of the evidence that an unregistered mark is entitled to trademark status. *See Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 907–08 (7th Cir.1983); *National*

*Conference,* 692 F.2d at 488. As we stated in *Walt–West Enterprises, Inc. v. Gannett Co., Inc.,* 695 F.2d at 1058, "a party attempting to appropriate the exclusive use of a descriptive term must ... rebut the presumption that the public regards the term as merely describing an attribute of the item...." Similarly, a party seeking trademark protection for initials of a descriptive term must rebut the presumption that the public regards the initials as standing for the descriptive term.

■ Thus, the district court's statement in footnote 48 to the *Heileman* opinion certainly does not miss the mark so fundamentally as to constitute legal error *per se.* Rather, it reflects the court's common sense view that, as a practical matter, initials do not usually differ significantly in their trademark role from the descriptive words that they represent.

### B.

Nor do we think, as Busch suggests, that the court's observation in footnote 48 tainted the district court's factual analysis and ultimate determination that LA is merely descriptive. To the contrary, the court acknowledges throughout its exhaustive opinion that the true test is one of consumer perception—how is LA perceived by the average prospective consumer? Accordingly, the court made specific factual findings that consumers actually understood LA as standing for and descriptive of low alcohol. *See Heileman,* 676 F.Supp. at 1459, 1460, 1487–88. These factual findings were based upon elaborate consumer surveys as well as Busch's own promotion-

---

8. As we declared in *Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 907 (7th Cir.1983):

The rationale for prohibiting the appropriation of such a descriptive term as a trademark rests upon the equal right of another individual producing and marketing a similar product to describe his or her product with similar accuracy. Were this right not protected by the law elements of the language could be monopolized in such a way as to impoverish others' ability to communicate. *See M.B.H. Enterprises, Inc. v. WOKY, Inc.,* 633 F.2d [50] at 55 [ (7th Cir.1980) ] (attempt to register the words "I LOVE YOU" as a trademark). In

recognition of the need to protect the language against incremental monopolization, this court has held that the terms "Auto Shampoo" and "Car Shampoo" were merely descriptive of the nature of a product used in cleaning and washing automobiles, *Wilhartz v. Turco Products,* 164 F.2d 731 (7th Cir.1947), and that "Telemed" merely described a process by which electrocardiograms were analyzed by computer over the telephone, *Telemed Corp. v. Tel–Med, Inc.,* 588 F.2d 213 (7th Cir.1978). In like fashion, we now hold that "Auto Page" is descriptive of the plaintiff's product here.

al advertising campaign and extensive media publicity.

Notwithstanding the parties' numerous objections to the consumer survey evidence submitted to the district court, we think the district court carefully and thoroughly sifted through this barrage of statistics and properly ascribed greater weight to those surveys warranting it. "[E]specially where statistical evidence is involved, great deference is due the district court's determination of whether the resultant numbers are sufficiently probative of the ultimate fact in issue." *Soria v. Ozinga Bros., Inc.*, 704 F.2d 990, 995 n. 6 (7th Cir.1983).

In particular, we agree that the marketing studies conducted by Dr. Yoram Wind, a Professor of Marketing at the Wharton School of the University of Pennsylvania, were not entitled to great weight.[9] In order to determine whether the initialism LA connotes (or denotes) low alcohol when displayed on a can of beer, Dr. Wind isolated the responses of those consumers who had never seen, heard of or tried LA beer. Of this sampling, comprised of those wholly unfamiliar with LA beer, only 4.9% associated LA with light, low or less alcohol, while 76.5% recognized LA as a brand name. When those respondents who had some prior exposure to LA were also taken into account, approximately 80% of the total pool surveyed, after being shown a can of "LA from Anheuser–Busch," identified Anheuser–Busch as the source of the beer. Based on these results, Dr. Wind concluded that LA does not connote low alcohol beer to consumers; rather, consumers perceive LA as a brand name.

■ We are persuaded by the view of the district court that Dr. Wind's primary focus on a thoroughly uninformed consumer audience renders his conclusions highly suspect. Whether initials stand in the public mind for the descriptive words from which they are derived is a question to be answered by looking at the public as it is—not as it might be in a total and unnatural state of disinformation. Consumer perception should be assessed by examining the average potential consumer in the context of the existing marketplace and exposed to the information currently available in the marketplace. This approach is supported by both law and logic. *See Application of Abcor Development Corp.*, 588 F.2d 811, 814–15 (C.C.P.A.1978) (consider advertisements to which the average prospective purchaser is presumed to have been exposed; to hold otherwise would "separate the concept of the average prospective purchaser from the world of reality"); *In re Venture Lending Associates*, 226 U.S.P.Q. 285 (T.T.A.B.1985); *Anheuser–Busch, Inc. v. Stroh Brewery Co.*, 750 F.2d at 645–46 (Bright, J., dissenting) (appropriate group of consumers to survey would be an informed group of consumers, familiar with low alcohol beer); 3 R. Callmann, *The Law of Unfair Competition Trademarks and Monopolies* § 18.04 (4th ed.1983). The opinions of the totally uninformed in an abstract, hypothetical context are of dubious relevance because they do not accurately reflect the perceptions of potential beer purchasers. Typically, someone must first be informed of the existence and nature of a product before he chooses to purchase or consume it. It is the perception of this somewhat informed audience that massive advertising is intended to impact. *See Application of Abcor Development Corp.*, 588 F.2d at 814. In addition, evidence of the context in which a mark is used on labels, packages or in advertising material is probative in assessing the likely reaction of prospective purchasers to the mark. *See id.* It is normal for the public to learn through advertising, casual exposure or word-of-mouth that the initials of descriptive phrases stand for those descriptive phrases. To disregard these factors and focus on a hypothetical, unenlightened public is illogical and may lead to illusory results.[10]

---

**9.** The district court's opinion provides a comprehensive discussion of the methodology and results of Dr. Wind's studies. *See Heileman*, 676 F.Supp. at 1485.

**10.** Busch cites *Independent Nail & Packing Co. v. Stronghold Screw Products*, 205 F.2d 921 (7th Cir.), *cert. denied*, 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391 (1953), in support of its "tabula rasa" theory that consumer perception should be mea-

Further, Dr. Wind's finding that a majority of the total consumer audience perceived LA as a brand name is not determinative of the issue presented. Even though a term is prominently displayed and perceived by poll respondents as a brand name on a beer label, the term may nonetheless be classified as merely descriptive for trademark purposes.[11]

For these reasons, we believe that the district court properly discounted the statistical evidence proffered by Busch and accorded greater weight to the survey results submitted by Heileman and Miller. These results demonstrated that a majority of prospective consumers recognize that LA, as applied to beer, stands for and describes low alcohol. *Heileman,* 676 F.Supp. at 1487–88. These consumer survey results were buttressed by the evidence of Busch's initial massive advertising campaign and media publicity which were likely to create a public perception that LA means light or low alcohol. *See Anheuser–Busch, Inc. v. Stroh Brewery Co.,* 750 F.2d at 649 (Bright, J., dissenting) ("I think it crucial to consider the initials 'LA' in the context of the Anheuser–Busch advertising and the probable course of development in the low alcohol beer segment."). Busch has failed to sufficiently counter this evidence and, therefore, has not met the burden of proof entitling it to trademark protection.

■ We recognize the apparent conflict in perspective and result between us and the Eighth Circuit, which classified LA as suggestive and thus entitled to trademark protection. *See Anheuser–Busch v. Stroh Brewery Co.,* 750 F.2d 631. Given the indeterminate nature of the classification spectrum, it is not unusual for courts to assign purported marks to different categories. Yet, in our view, LA is more aptly deemed merely descriptive than suggestive. A suggestive term, as the word implies, suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods. *See Miller Brewing Co. v. G. Heileman Brewing Co.,* 561 F.2d 75, 79 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978). "Generally speaking, if the mark imparts information directly, it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." *Union Carbide Corp. v. Ever–Ready, Inc.,* 531 F.2d 366, 379 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). As the district court discerned below, "Ini-

---

sured by testing only those persons totally unfamiliar with LA beer. Specifically, Busch adverts to the following language in *Independent Nail:*

> Although the word "Stronghold" is suggestive of one of the attributes of plaintiff's nail with the annular thread, it is not descriptive of a nail, let alone that type of nail. A person unaware of the particular product or the manufacturer, upon seeing or hearing the name "Stronghold," would find it virtually impossible to identify the product to which it might have been applied. The label "Stronghold" on a carton, with no other words to designate the contents, would never reveal that such contents were nails of a particular type.

*Id.* at 925. We do not view this language as an authoritative statement defining the relevant consumer audience for determining trademark status. Nor has this court ever cited this language in *Independent Nail* as authority for Busch's position. Rather, in *Union Carbide Corp. v. Ever–Ready Inc.,* the district court and this court on appeal both acknowledged that this particular language in *Independent Nail* was

"troublesome." *See* 392 F.Supp. 280, 287 (N.D. Ill.1975), *rev'd,* 531 F.2d 366, 379 (7th Cir.1976). Whether a purported mark is descriptive should not be determined in a vacuum or by an audience of ostriches. Instead, consumer perception should be measured by considering the mark as applied to the product in question and the "reaction of the consumer audience to which the trademark is directed in the marketplace." 3 R. Callman, *The Law of Unfair Competition Trademarks and Monopolies* § 18.04 (4th ed. 1983).

11. As Judge Bright correctly pointed out in his dissent in *Anheuser–Busch, Inc. v. Stroh Brewery Co.,* 750 F.2d 631:

> The average consumer presumably has no conception of what is legally required for a brand name to receive trademark protection. Thus, just because a majority of the consumers surveyed thought, after being exposed to a can prominently labeled LA and advertising that stressed LA as the brand name, that LA was the brand name may not establish that the mark is entitled to trademark status.

*Id.* at 647.

tials do not 'suggest' or 'connote' the words for which they stand, they directly denote those words." *Heileman,* 676 F.Supp. at 1491. In general, the "imagination" required to link a suggestive term with the corresponding product "refers to the mental process required to connect a name that is incongruous or figurative with the product (e.g., 'Roach Motel' with an insect trap or 'TIDE' with soap), not the intermediate thought process needed to translate initials into the name which directly describes the salient characteristic of the product." *Id.* at 1491 n. 46. *Cf. Union Carbide Corp. v. Ever–Ready Inc.,* 531 F.2d 366, 379 (7th Cir.1976) (in distinguishing between suggestive and descriptive marks, "incongruity" between a purported mark's ordinary meaning and its use in relation to a specific product is a strong indication of non-descriptiveness).

■ Putting aside prescribed categories for a moment, we agree with the reasoning of Judge Bright's dissent in the Eighth Circuit *Anheuser–Busch* case. As Judge Bright points out, the objectives of trademark law are twofold: (1) to prevent confusion among consumers as to the source of goods or services; and (2) to indicate ownership and permit the trademark owner to control the product's reputation. *Anheuser–Busch, Inc. v. Stroh Brewery Co.,* 750 F.2d 631, 644 (Bright, J., dissenting) (citing *James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 274 (7th Cir. 1976); *Sweetarts v. Sunline, Inc.,* 380 F.2d 923, 927 (8th Cir.1967); 3 R. Callmann, *The Law of Unfair Competition Trademarks and Monopolies* §§ 7.01, at 2 & 17.13, at 58 (4th ed.1983)). Accordingly, to acquire trademark protection, Anheuser–Busch must establish that "LA primarily serves to designate its source (from Anheuser–Busch) rather than to describe or indicate a characteristic that it shares with other beers of low alcoholic content produced by other brewers." *Id.* at 644. Because Busch has not sufficiently made such a showing, we agree with the district court in the present case that LA is not a protectible trademark.

## C.

■ Since we do not think that the district court clearly erred in its factual determination that LA is merely descriptive, we further conclude that the district court did not err in denying the requests by Heileman and Miller for a declaratory judgment that LA is generic, as well as for permanent injunctive relief. Heileman and Miller claim that, because LA is generic as a matter of law, they are entitled to an injunction permanently enjoining Busch from interfering with Heileman and Miller's use of the LA name. Presumably, the concern is that the "merely descriptive" designation may allow Busch to later claim secondary meaning and again seek trademark protection. Otherwise we do not understand why the plaintiffs would link a determination of genericness to their request for a permanent injunction. Heileman and Miller contend somewhat cryptically in their briefs that a permanent injunction and a "generic" declaration are necessarily intertwined. If so, our independent conclusion that the district court did not abuse its discretion in denying permanent injunctive relief obviates the need for us to decide the genericness question. In any event, we think LA is probably not generic.

As we recently explained in *Henri's Food Products Co., Inc. v. Tasty Snacks, Inc.,* 817 F.2d 1303, 1305–06 (7th Cir.1987),

> an adjective can be a generic term when that word is a part of a common descriptive name of a *kind* of goods. In order to be generic, however (as the word implies), the word in question must serve to denominate a type, a kind, a genus or a subcategory of goods.

The dispositive question is whether "LA" was

> a commonly used and commonly understood term prior to its association with the product or products at issue. And the dictionary, with its continuing catalogue of words arriving in and departing from common speech, is an especially appropriate source of evidence about the meaning attached by a linguistic group to a particular [ ] symbol.

*Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 905 (7th Cir.1983). With respect to this issue, the district court cited two historical facts which, in its view, precluded a finding of genericness: low alcohol beer was a new arrival on the beer market in this country and, prior to April 27, 1984, BATF regulations prohibited references to low alcohol content in the advertising or labeling of beer. Consequently, consumer surveys illustrated that many consumers evidently were unaware of low alcohol beer at all and, as the district court found, "it was not surprising that the poll takers found that these consumers, as well as those with only recent exposure to the product, had not formed a consensus that 'LA' or 'low alcohol' is the name of a distinctive type of beer." *Heileman*, 676 F.Supp. at 1490. In addition, the district court noted that there was no evidence that either "LA" or "low alcohol" is defined by any lexicon as a genus of beer. *Id.* at n. 45. Based upon these findings, it is certainly reasonable to conclude that LA is not generic. *Cf. Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 80 ("light" classified as generic where it had been widely used in the beer industry before Miller began using "LITE" and was defined in the dictionary as a characteristic of beer).

In any event, as we have noted, we do not think the district court abused its discretion in denying Heileman and Miller permanent injunctive relief. The court reasoned that, given its findings and conclusions, it did "not expect that Anheuser-Busch will continue to interfere with the use of the 'LA' name for low alcohol beer by Heileman and Miller. The plaintiffs have produced no evidence that Anheuser-Busch will continue to threaten lawsuits, nor have they otherwise established the possibility of prospective irreparable injury." *Heileman*, 676 F.Supp. at 1500. As the Supreme Court has opined, " 'Ordinarily ... the practical effect of injunctive and declaratory relief will be virtually identical so that if the court can protect the interests of a plaintiff by entering a declaratory judgment, the stronger injunctive medicine will be unnecessary.' " *Wooley v. Maynard*, 430 U.S. 705, 711, 97 S.Ct. 1428, 1433, 51 L.Ed.2d 752 (1977) (quoting *Samuels v. Mackell*, 401 U.S. 66, 73, 91 S.Ct. 764, 768, 27 L.Ed.2d 688 (1971)). In the absence of evidence to the contrary, we think that a declaratory judgment that LA is merely descriptive and unprotectible under the trademark laws sufficiently protects the plaintiffs' interests. Thus, the refusal to permanently enjoin Anheuser-Busch was not an abuse of the district court's discretion.

### D.

Having resolved that LA is a merely descriptive term, it is entitled to trademark protection only upon a showing of secondary meaning—namely, that consumers associate LA with the producer (Anheuser-Busch). *See A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 907 (7th Cir. 1986).[12] Busch apparently concedes that the district court properly concluded that insufficient time had elapsed between April 1984, when Busch first used LA on beer labels distributed in retail markets, and several weeks later when Heileman commenced its use of LA. *See Heileman*, 676 F.Supp. at 1459. Nevertheless, Busch now asserts that this court should apply the theory of "secondary meaning in the making." A few authorities espouse the view that secondary meaning in the making should be protected to prevent intentional attempts to capitalize on the efforts and goodwill of others. *See, e.g., Orion Pictures Co. v. Dell Publishing Co.*, 471 F.Supp. 392, 396 (S.D.N.Y.1979) (dicta); *Glamorene Products Corp. v. Boyle–Midway, Inc.*, 188 U.S.P.Q. 145, 165 (S.D.N.Y. 1975). *But see Black & Decker Mfg. Co. v.*

---

12. The court considers a variety of factors in determining whether a mark has acquired secondary meaning including " '[t]he amount and manner of advertising, volume of sales, the length and manner of use, direct consumer testimony and consumer surveys.' " *Int'l Kennel*

*Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1085 (7th Cir.1988) (quoting *Gimix, Inc.*, 699 F.2d at 907 (quoting *Union Carbide Corp. v. Ever–Ready, Inc.*, 531 F.2d 366, 380 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976))).

*Ever–Ready Appliance Mfg. Co.*, 684 F.2d 546, 550 (8th Cir.1982) (expressly rejecting theory of secondary meaning in the making); *A.J. Canfield Co. v. Concord Beverage Co.*, 629 F.Supp. 200, 211–12 (E.D.Pa. 1985), *aff'd on other grounds sub nom. A.J. Canfield Co. v. Honickman*, 808 F.2d 291 (3rd Cir.1986). Anheuser–Busch argues that Heileman and Miller sought to make LA the "category generic" thereby sabotaging the development of secondary meaning and capitalizing on Busch's efforts to promote its new product.

■ This argument can be rejected rather summarily because Busch did not raise the ingenious theory of secondary meaning in the making below and has, therefore, effectively waived it for purposes of appeal. In any event, this court has never recognized the theory of secondary meaning in the making and we do not think this is an appropriate occasion for doing so. Here there was no evidence that Heileman and Miller used the LA label to capitalize intentionally on Busch's goodwill—assuming, for argument's sake, that goodwill can exist before secondary meaning has developed. To the contrary, the district court found that the plaintiffs used LA in good faith to describe a characteristic of their new low alcohol beer. *See Heileman*, 676 F.Supp. at 1494–95.

Moreover, if a doctrine of secondary meaning in the making were to be recognized, initials standing for a descriptive phrase would be an unlikely subject for its application. Rather than employing a doctrine of secondary meaning in the making, a more befitting doctrine here might recognize *primary* meaning, i.e., as a descriptive term, in the making. LA either means low alcohol or is a short step away from this meaning.

## IV.

■ Even if LA is deemed a merely descriptive term and is not cognizable as the subject of a valid trademark infringement claim, this court has intimated previously that the first user of a mark may maintain an action for unfair competition under the Lanham Act by showing a likelihood of confusion as to the source of the goods in question. *See Liquid Controls, Corp. v. Liquid Control Corp.*, 802 F.2d 934, 939–40 (7th Cir.1986); *Technical Publishing Co. v. Lebhar–Friedman, Inc.*, 729 F.2d 1136, 1142 (7th Cir.1984); *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 997 (7th Cir.1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980).[13] The district court's findings with respect to the likelihood of confusion are findings of fact, and are subject to a clearly erroneous standard of review. *See Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1087 (7th Cir.1988); *Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 354 (7th Cir.1983) (citation omitted). While there are a myriad of variables to be considered in determining whether a likelihood of confusion exists, the most important factors include the similarity of the marks, the intent of the claimed infringers and the evidence of actual confusion. *See Ziebart Int'l Corp. v. After Market Associates, Inc.*, 802 F.2d 220, 226 (7th Cir.1986). In its assessment of the relevant factors, the district court found that Heileman's use of a prominent house mark in juxtaposition with the "category descriptor" LA, e.g., "BLATZ L.A.," and, similarly, Miller's use of a prominent brand name in conjunction with LA, e.g., "SHARP'S LA," dispelled any significant likelihood of confusion. *See Lindy Pen Co. v. BIC Pen Corp.*, 725 F.2d 1240, 1245 n. 4 (9th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 955, 83

**13.** This proposition is supported by the express language of the Lanham Act which provides in relevant part:

(a) Any person who shall ... use in connection with any goods or services, ... a false description of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or

services to enter into commerce, ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a).

L.Ed.2d 962 (1985); *Philip Morris, Inc. v. R.J. Reynolds Tobacco Co.*, 188 U.S.P.Q. 289, 294 (S.D.N.Y.1975) (Marlboro Lights and Winston Lights; use of house mark obviated likelihood of confusion). Moreover, Busch uses LA only in conjunction with its corporate source and its well-known "A & Eagle" trademark design, *i.e.*, "LA from Anheuser–Busch." In addition, the consumer survey evidence offered by Heileman showed that only 4.5% of consumers were likely to be confused about the source due to the use of the initials LA.[14] Finally, the district court found that Heileman and Miller lacked the intent to deceive or "pass off." *Id.* at 1496.

> Passing off is a type of fraud. We have defined it as trying to get sales from a competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off. Copying is not necessarily passing off. When the term copied is descriptive, copying is consistent with an inference that the copier wanted merely to inform consumers about the properties of its own product.

*Liquid Controls, Corp. v. Liquid Control Corp.*, 802 F.2d 934, 940 (7th Cir.1986) (citing *Blau Plumbing*, 781 F.2d at 611). Although Busch bears the burden of proving likelihood of confusion, it offered no relevant consumer survey to rebut the statistical results submitted by Heileman or other evidence to undermine the district court's factual findings. Accordingly, we do not think the court's finding of no likelihood of confusion was clearly erroneous.

### V.

In the present case, the initials LA were used descriptively (or possibly generically) in Australia for "low alcohol." They were removed from that context to be brought back by Mr. Busch for use in the United States. Although it is conceivable that they would not fulfill a descriptive function here as well, it is the more plausible assumption that they would.[15]

It would be unusual trademark policy to accord exclusive rights and trademark protection to Anheuser–Busch, which appropriated the LA appellation from Australia and then used it in a descriptive manner to preempt the low alcohol beer market in this country.

> The trademark laws ... are designed to protect names selected by a company and promoted with the intent of indicating the ownership and source of the goods. It is inconsistent with the objectives of the trademark laws to suggest that the protection of those laws should be extended to cases in which a company attempts to arrogate for business-promotional reasons a mark that is essentially descriptive.

*Anheuser–Busch, Inc. v. Stroh Brewery Co.*, 750 F.2d at 651 (Bright, J., dissenting).

**14.** On appeal, Anheuser–Busch argues that the relevant statistic is 11.9%, which reveals a more significant likelihood of confusion than the 4.9% statistic relied upon by the district court. The district court apparently selected the latter figure because it reflected consumer confusion purportedly *caused by* the use of the initials LA, whereas the 11.9% statistic represented confusion ensuing from other extraneous causes. In light of the deferential standard of review on this issue, *see Soria v. Ozinga Bros., Inc.*, 704 F.2d 990, 995 n. 6 (7th Cir.1983), we shall not quibble about these statistical minutiae beyond stating that we do not think the district court's factual analysis of the statistical evidence is clearly erroneous.

**15.** Apparently, LA has assumed descriptive or generic status in Australia where the widely-accepted "bar call" for low alcohol beer has become, "Give me an LA." We do not suggest that merely because initials have attained descriptive status in a foreign country they should necessarily be treated similarly here. *See Donald F. Duncan, Inc. v. Royal Tops Mfg. Co., Inc.*, 343 F.2d 655, 661–62 (7th Cir.1965) (generic use of "yo-yo" in Philippines not necessarily dispositive of trademark status in this country). Of course, the relevant test is consumer perception in this country. Nevertheless, we think the Australian experience illustrates the propensity for initials of descriptive phrases to become ineluctably recognized as such. The Australian history thus supports the presumption that initials of descriptive phrases also fall within the descriptive classification. *Cf. Anheuser–Busch, Inc. v. Stroh Brewery Co.*, 750 F.2d at 648 (Bright, J., dissenting) ("It seems highly likely that LA will become the 'bar call' for low alcohol beer in the United States, just as it did in Australia. Indeed, this is precisely what Anheuser–Busch intended to capitalize on when it selected LA as the name for its low alcohol beer.") (citations omitted).

The determination by the district court that LA is merely descriptive and unprotectible is supported by the record and consistent with sound policy. Therefore, the decision of the district court is

AFFIRMED.