THIS DECISION IS CITABLE
AS PRECEDENT OF THE
TTAB

Hearing:                                          Paper No. 13
March 5, 2003                                     TJQ
                                                 Mailed:7/30/03

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

## Trademark Trial and Appeal Board

_____

Capital Project Management, Inc.
v.
IMDISI, Inc.

_____

Opposition No. 121,819
to application Serial No. 75/474,121
filed on April 24, 1998

_____

Nicholas Guarente and Mark A. Garzia of the Law Offices of
Mark Garzia for Capital Project Management, Inc.

Camille M. Miller and Brian J. Urban of Cozen O'Connor for
IMDISI, Inc.

_____

Before Hanak, Quinn and Rogers, Administrative Trademark
Judges.

Opinion by Quinn, Administrative Trademark Judge:

An application has been filed by IMDISI, Inc. to
register the designation TIA for "investigation of problems
experienced on construction projects using a technique which
analyzes the effect of a particular event on schedulized
activities."[1]

---

[1] Application Serial No. 75/474,121, filed April 24, 1998,
alleging first use anywhere and first use in commerce in October
1981.  The application was originally filed by MDC Systems, Inc.
An assignment of the application to the above-named applicant was

Registration has been opposed by Capital Project Management, Inc. on the ground that the designation TIA, when used in connection with applicant's services, is generic or merely descriptive thereof.[2]

Applicant, in its answer, denied the salient allegations of the notice of opposition.

The record consists of the pleadings; the file of the involved application; trial testimony, with related exhibits, taken by each party; discovery depositions and applicant's responses to opposer's discovery requests (interrogatories and requests for admissions), introduced by way of opposer's notices of reliance; and discovery

---

recorded in the Assignment Branch records of the Office on April 19, 2000 at reel 2069, frame 0798. In view thereof, IMDISI, Inc. is substituted as the party defendant in this proceeding. It should be noted, however, that references in this decision to "applicant" mean MDC Systems, Inc.

[2] To the extent that there is any confusion regarding the issues in this case, it is clear that the issues are genericness and mere descriptiveness under Section 2(e)(1) of the Trademark Act. Applicant, in its brief, lists the above issues as well as a third issue, namely likelihood of confusion under Section 2(d). A review of the notice of opposition shows the following allegation as paragraph 14:

> The use of the mark TIA by Applicant on the services specified in Application Serial No. 75/474,121 is likely to cause confusion, mistake or deception such that consumers will believe that Opposer's use (and the use by others in the construction management trade) of Time Impact Analysis techniques in their daily business are actually techniques that belong to, or originate from, the Applicant.

It is clear from the trial in this case and the arguments in the brief and at the oral hearing that opposer is not claiming any proprietary rights in the designation TIA, and that the above pleading is part of its claim under Section 2(e)(1).

depositions, and opposer's responses to applicant's discovery requests (interrogatories and requests for admissions) made of record by applicant's notice of reliance.[3] The parties filed briefs, and both were represented by counsel at an oral hearing before the Board.

The record in this case is voluminous, with thousands of pages of testimony and hundreds of pages of exhibits. The deposition testimony is replete with objections, most of them entirely unnecessary. It is obvious, from a review of the record and the briefs, that this litigation has been overly contentious. The clashes between counsel contributed nothing in advancing the merits of this case. Be that as it may, before turning to the merits, we first direct our attention to some evidentiary objections which applicant has maintained in its brief.

The first objection involves applicant's attempt to strike the expert witness testimony of Thomas Driscoll and Walter Cosinuke.[4] According to applicant, these witnesses

---

[3] Applicant also submitted with its notice of reliance documents produced by opposer in response to applicant's document production requests. However, documents produced in response to document production requests may not be made of record by way of notice of reliance. See: Trademark Rule 2.120(j)(3)(ii). In this instance, however, opposer essentially has treated the documents to be of record and, accordingly, we deem them to be stipulated into the record. (It is further noted that many of the produced documents were also identified as exhibits during testimony.) In sum, all of the involved documents have been considered by the Board.

[4] Messrs. Driscoll and Cosinuke also were offered as fact witnesses by opposer.

3

"were unqualified to render expert opinion as to the issues of registrability of the TIA service mark, and their testimony was not scientific, technical or specialized, nor based on reliable principles and methods to qualify as admissible expert testimony."  (brief, p. 18)

The record shows that Messrs. Driscoll and Cosinuke have numerous professional accreditations, accomplishments and overall experience in the construction management field. Although neither witness has ever testified in a trademark case, that fact hardly diminishes their expert knowledge in the construction management field wherein opposer claims the subject mark to be generic or merely descriptive.  Neither witness received any compensation for his testimony.

Mr. Driscoll indicated that he has testified as an expert in at least twenty construction claim cases at the state and federal levels, and that he has appeared before arbitration panels and a jury.  In addition, Mr. Driscoll is a member of the American Arbitration Association Panel of Construction Arbitrators, and he has been an arbitrator on 3-4 occasions.  Over a period of forty years, Mr. Driscoll has taught numerous classes and given presentations on scheduling techniques, and has been involved in authoring parts of three books on the subject.  Mr. Driscoll has been involved in scheduling analyses for numerous projects, including Denver International Airport and the Chunnel.

Although Mr. Cosinuke is testifying in this case as an expert for the first time, he is now retired after a long career in the construction management field. During his career, Mr. Cosinuke taught at almost 200 seminars and workshops (exhibits show Mr. Cosinuke scheduled as a speaker on the Critical Path Method[5] dating back to the early 1960's), and was involved in construction schedule analyses of projects such as the World Trade Center and the Apollo moon program (Vehicle Assembly Building, and launch complexes). A representative list shows that Mr. Cosinuke and his company have been involved in many "mega projects" (i.e., at least $1 billion).

Accordingly, we find that both individuals qualify as experts in the construction management field, specifically with respect to claims analysis of time delays in construction schedules. In reading their testimony, we have not, of course, considered them to be experts in trademark law, and any opinion relating to the ultimate question of law in this case has been given no weight. See, e.g., Harjo v. Pro-Football Inc., 50 USPQ2d 1705, 1718 (TTAB 1999); and Medtronic, Inc. v. Medical Devices, Inc., 204 USPQ 317, 325 (TTAB 1979).

Applicant also has lodged numerous objections, grounded on hearsay and lack of proper foundation, to testimony about

---

[5] See explanation of the Critical Path Method, infra.

5

certain documents.  Suffice it to say, in reviewing the record, that we have accorded this testimony whatever probative weight it merits.

Applicant further has objected to opposer's "imputing particular knowledge to Applicant through discovery deposition testimony from officers and directors of Applicant that were not produced to testify on behalf of Applicant."  (brief, p. 21)  After reviewing the testimony of the three individuals called by opposer's notices of deposition, it is readily apparent that Robert McCue (applicant's president), James McKay (applicant's executive vice president) and William Wheatley (chairman of a subsidiary of applicant), officers and shareholders of applicant, all possess personal knowledge of many aspects of applicant's business activities, including those relating to applicant's use of the designation TIA.  Given their intimate knowledge of applicant's business, we find it appropriate to impute their knowledge to applicant.  That applicant did not call these individuals as witnesses does not undermine the probative value of their testimony during discovery depositions noticed and taken by opposer.  As the rules clearly allow for the introduction at trial, by notice of reliance, of discovery depositions a party takes of its adversary, there can be no question that such depositions

6

are an acceptable method for gathering evidence for trial.
See:  Trademark Rule 2.120(j).

In sum, we have considered all of the testimony and related exhibits, as well as all of the other evidence, in reaching our decision, according each item whatever probative value it merits.  In doing so, we also note that applicant, in some instances, has relied upon certain evidence to which it has objected (see, for example, applicant's notice of reliance on the D'Onofrio testimony with exhibits identified and introduced during the deposition).  In these instances, the objection is deemed to have been waived.

We now turn to the merits of the opposition.

### The Parties

Opposer is a consulting firm engaged in providing claims analysis, expert witness services, construction project management oversight services, and project scheduling services.  In the words of Michael D'Onofrio, opposer's president, "[b]asically, we are consultants to the construction industry."

IMDISI, Inc. is a holding company for the intellectual property rights of the original applicant, MDC Systems, Inc. (hereinafter "MDC").  MDC, like opposer, is engaged in the construction project and management consulting field, offering, inter alia, management of problem projects,

7

preparation of contract claims, and claims prevention, mitigation and resolution services.  In addition to the present application, applicant filed an application to register the term TIME IMPACT ANALYSIS, Serial No. 75/474,122.  The applications were filed on the same day and identify the services in an identical manner, namely "investigation of problems experienced on construction projects using a technique which analyzes the effect of a particular event on schedulized activities."[6]

Applicant's website (www.mdcsystems.com) shows the following use, which is representative of other uses in applicant's promotional materials:  "Time Impact Analysis.  TIA is a court-accepted schedule analysis technique created by MDCSystems.  Coupled with the application of legal principles, TIA provides a means for equitably apportioning time-related construction disputes."[7]

## Overview of Schedule Analysis

The parties both specialize in some of the same areas, including analysis of the impact of time delays on the schedules of construction projects.  Construction claim

---

[6] Application Serial No. 75/474,122 was amended to seek registration on the Supplemental Register.  In that application, the Examining Attorney issued a final refusal grounded on genericness and applicant filed an appeal.  A check of Office records shows that the appeal was dismissed due to applicant's failure to file an appeal brief, and the application was deemed abandoned on June 10, 2003.

[7] The literature includes a claim that "Time Impact Analysis" and "TIA" are service marks of applicant.

disputes often involve allegations of impact and delay.
Time delays obviously can result in legal claims, and there
are a variety of methods to determine or evaluate the impact
of delays on a specific project.  Every construction project
has a schedule:

> Time is a critical element in the
> construction process.  Gaining and
> maintaining control of the time factor
> is essential if you want to achieve the
> goal of completing projects on time,
> within budget, and in accordance with
> the plans, specifications, and quality
> expected.  To attain this objective, it
> is necessary for all parties involved in
> a project to have a basic understanding
> of scheduling and make a commitment to
> plan and implement schedules
> effectively.  Such a commitment is vital
> in order to cope with the complex
> factors of inflation and escalation,
> lack of materials, labor shortages,
> multiple prime contracts, third-party
> relationships, construction management
> concepts, and frequent lack of controls.
>
> In its practical use, a project
> schedule is a warning device for
> focusing attention on situations at the
> stage where trouble is developing, but
> still capable of being avoided with
> prudent management, decisions, and
> actions.  In addition, the schedule is a
> device for monitoring progress,
> measuring progress, and, therefore, can
> be used as a sword or shield in
> presenting or refuting time extensions
> and claims for extra cost.
>
> Over the past three decades, the
> importance of scheduling has increased
> significantly...As a result, the use of
> a schedule for legal purposes (sometimes
> [ex] post facto) has become almost as
> important to the success of a project as
> the schedule is for planning and

controlling the project during project implementation.

Time Impact Analysis:  A Key for Successful Proof of Delay (Paper presented by Thomas J. Driscoll to the Fifth Annual Construction Litigation Superconference, December 6, 1990).

It may become necessary to determine the cost of time lost because of various types of delays encountered during the life of a construction project, and that is where schedules and their updating take on increased importance:

> A construction project by its very nature is dynamic.  Plans and estimates, no matter how carefully considered, are bound to change as a result of unexpected events.  Strikes, unusually bad weather, sudden material shortages, unforeseen subsurface conditions, and change orders are a few of the factors that may result in a need to change the project schedule.  The project schedule must continually reflect these changes or become outdated and misleading.  To be successful, a schedule must be accurate, and to be accurate, it must be kept up-to-date and revised on a regular basis.  Indeed, the failure to update the schedule can be fatal to the contractor's claim.

> The periodic review of the project schedule and daily progress is termed updating.  The object of updating the schedule is to determine physical progress to date, identify sequence revisions and duration changes, and thus provide a complete and accurate report of how well the actual construction progress compares with the established schedule.  In addition, its purpose is to determine how all parties intended to continue the work and meet the overall schedule objective.
> *****

10

> Calculating the extent of delay can best be accomplished through a process called time impact analysis.  This procedure utilizes network schedule techniques (fragnets) and an analysis of the facts associated with each delay to demonstrate the effect of specific delays on the overall project schedule.
>
> Many project specifications include time impact analysis procedures...
>
> When change orders, delays, or problems do occur, a time impact analysis should be prepared to document the facts and circumstances and to quantify the estimated delay and/or impact on the project schedule...
>
> Network schedule techniques have great utility in evaluating delay and impact on a project.  These techniques permit simultaneous proof of both the fact and the cause of delay.  Accordingly, a time impact analysis can be an effective tool for determining whether or not certain work was delayed and if it had an impact on the overall project.

Proving and Pricing Construction Claims (2d ed. 1996).

Analysis of delays is directly related to a technique called "Critical Path Method" (CPM) which is used to keep a project schedule up to date by accurately indicating actual performance and delays as they occur.  A continuously updated and revised CPM allows one to do an accurate schedule analysis at any given point in the construction project.  The Critical Path Method is basically a graphic presentation of the planned sequence of activities which shows the interrelationships and interdependencies of the

elements comprising a construction project.  An

administrative tribunal with expertise in the field, the

Corps of Engineers Board of Contract Appeals, described in

detail the Critical Path Method as follows:

> The CPM scheduling technique is one
> which requires a breakdown of the entire
> project into individual tasks and an
> analysis of the number of days required
> to perform each task.  The analysis is
> then programmed into a computer, which
> produces a chart showing the tasks and a
> line which controls the completion of
> the overall work.  The line through the
> nodes, the junction points for
> completion of essential tasks, is known
> as the critical path.  In addition there
> are numerous side paths for subordinate
> tasks, which normally can be performed
> without affecting the critical path.
> However, these subordinate tasks, if
> improperly scheduled or unduly delayed
> in performance, can on occasions become
> critical and thus change the critical
> path for the entire project.
>
> The critical path method of scheduling
> requires the logical analysis of all the
> individual tasks entering into the
> complete job and the periodic review and
> re-analysis of progress during the
> performance period.  It is essential
> that any changes in the work and the
> time extensions due the contractor be
> incorporated into the progress analysis
> concurrently with the performance of the
> changes, or immediately after the delay,
> and thus integrated into the periodic
> computer runs to reflect the effect on
> the critical path.  Otherwise, the
> critical path chart produced by the
> computer will not reflect the current
> status of work performed or the actual
> progress being attained.

Continental Consolidated Corp. v. United States, ENG BCA Nos. 2743, 2766, 67-2 BCA, PP 6624:  68-1 BCA PP 7003.[8]

As shown by the record, network analysis techniques, such as Critical Path Method, were first introduced into the construction field in the early 1960's.  Governments now require network analyses on most, if not all, major construction projects.  The utilization of Critical Path Method techniques to plan and schedule work has become the accepted standard in the construction field.  Boards of contract appeals and courts have shown a willingness to utilize such techniques to identify delays and their causes. Jon M. Wickwire, Stephen B. Hurlbut and Lance J. Lerman, "Use of Critical Path Method Techniques in Contract Claims: Issues and Developments 1974 to 1988," Public Contract Law Journal, (March 1989).

One of the techniques which has its foundation in Critical Path Method principles is referred to as "time impact analysis."  According to Mr. Driscoll, the technique has "been around for ages" dating back to the early 1960's; the objective of such analysis is "to pinpoint, isolate, and quantify any time impact associated with a specific issue

---

[8] A copy of this decision was introduced into the record by opposer.  Generally, decisions of courts or other tribunals are relied upon for legal principles, rather than for purposes of establishing facts.  Here, however, we find that the Board of Contract Appeals has presented a succinct summary of factual information found in materials or testimony otherwise properly of record.

and determine its time relationship to past or other current delays."

### Genericness Analysis

A mark is a generic name if it refers to the class or category of goods and/or services on or in connection with which it is used. In re Dial-A-Mattress Operating Corp., 240 F.3d 1341, 57 USPQ2d 1807 (Fed. Cir. 2001), citing H. Marvin Ginn Corp. v. International Association of Fire Chiefs, Inc., 782 F.2d 987, 228 USPQ 528 (Fed. Cir. 1986). The test for determining whether a mark is generic is its primary significance to the relevant public. Section 14(3) of the Act; In re American Fertility Society, 188 F.3d 1341, 51 USPQ2d 1832 (Fed. Cir. 1999); Magic Wand Inc. v. RDB Inc., 940 F.2d 638, 19 USPQ2d 1551 (Fed. Cir. 1991); and H. Marvin Ginn Corp. v. International Association of Fire Chiefs, Inc., supra. Evidence of the relevant public's understanding of a term may be obtained from any competent source, including testimony, surveys, dictionaries, trade journals, newspapers, and other publications. In re Northland Aluminum Products, Inc., 777 F.2d 1556, 227 USPQ 961 (Fed. Cir. 1985).

### The Category of Services and the Relevant Public

In determining genericness, we must first identify the category of services at issue. As noted above, applicant's services are identified as "investigation of problems

14

experienced on construction projects using a technique which analyzes the effect of a particular event on schedulized activities." Applicant's Internet website indicates that its analysis "provides a means for equitably apportioning time-related construction disputes" and that analysis of scheduling documents "allows assignment of causation and quantification of delay."

In this case, the category or type of services identified in the involved application is clear: scheduling analysis services for construction projects.

Also clear is the relevant public for these services. In this case, the relevant public is highly sophisticated, and would include engineers, architects, lawyers, construction owners, contractors and other professionals in the construction management field who purchase schedule analysis services. The relevant public also would include courts, boards of contract appeals, arbitrators and others in the field who read or are concerned with schedule analysis reports. This relevant public, comparatively small in size, would be involved in some capacity with schedules in construction projects (before, during or after). See: The Loglan Institute Inc. v. The Logical Language Group Inc., 962 F.2d 1038, 22 USPQ2d 1531 (Fed. Cir. 1992)[limited size of relevant group]. Oftentimes, the construction projects involve major corporations and governmental

15

agencies.  Mr. D'Onofrio testified that time impact analyses can cost upwards of hundreds of thousands of dollars.

That brings us to the critical question in this case, namely whether the designation "TIA" is understood by the relevant public in the construction management field primarily to refer to the class of scheduling analysis services involving time impact analysis.

We find that opposer, as the party making the charge of genericness, has proved its claim by a preponderance of the evidence.  Martahus v. Video Duplication Services Inc., 3 F.3d 417, 27 USPQ2d 1846, 1850 (Fed. Cir. 1993).  In the construction management field, "TIA" is synonymous with "time impact analysis," and the relevant public in the field will know what "TIA" means.

## Time Impact Analysis

We first examine the record with respect to uses of the term "time impact analysis."  The record is replete with such use in a generic manner to name a type or kind of schedule analysis in construction projects.

> O'Brien had been requested by the
> Contracting Officer to prepare a time
> impact analysis to determine how the
> change proposals and extra work claims
> had affected project completion...
> (Appeal of NAB-Lord Associates, Postal
> Service Board of Contract Appeals, 1984
> PSBCA LEXIS 51, August 30, 1984)
>
> Once construction is commenced, it may
> be necessary to quantify the time impact
> that may be caused by various types of

16

delays encountered during a project. Calculating the extent of delay can best be accomplished through a process called time impact analysis.
(Manual of Standards of Practice, Construction Management Association of America (1986))

"Time impact analysis" uses the updated as-built schedule as the baseline to evaluate any impact or delay to the work.
(Construction Law Handbook (1999))

On March 9, 1993, Cogefar submitted a time impact analysis to the FBOP setting forth the events which had a significant impact on the work to date and a projection of how those events would impact the contract completion date.
(Appeal of Cogefar-Impresit U.S.A., Inc., U.S. Department of Transportation Board of Contract Appeals, 1997 DOT BCA LEXIS 8, August 27, 1997)

Once a project is started, it becomes necessary to determine the amount of time impact that may be caused by the various types of delays encountered during the life of the project. A suggested method for calculating the extent of delay is the use of updated (as-built) critical path method (CPM) schedules in conjunction with a process called time impact analysis...In recent decades, the techniques of time impact analysis have been used successfully on projects to justify or refute time delays.
(Jon M. Wickwire, Thomas J. Driscoll and Stephen B. Hurlbut, Construction Scheduling: Preparation, Liability, and Claims, (1991))

The Time Impact Analysis technique is most effective when required by the contract as part of the scheduling specification.
(Jon M. Wickwire, Stephen B. Hurlbut and

> Lance J. Lerman, "Use of Critical Path
> Method Techniques in Contract Claims:
> Issues and Developments 1974 to 1988",
> <u>Public Law Contract Journal</u>, (March
> 1989))
>
>
> Calculating the extent of delay can best
> be accomplished through a process called
> Time Impact Analysis, which is a time
> estimating procedure that utilizes
> networking techniques to demonstrate the
> effect of specific delays on the project
> schedule.
> (Thomas J. Driscoll, The Project
> Schedule as a Tool, Sword and Shield,
> paper prepared for The Corps Of
> Engineers Network Analysis for
> Executives Seminar, May 1984)

As to such third-party uses of the term as shown above, applicant's president, Mr. McCue, states that "I am aware of some people using the term time impact analysis infrequently because it is associated so closely with us that it is just marketing for MDC every time they use it." Mr. McCue adds, "[I]t is my testimony now and forever more that we do it right and other people are imitators and they do it wrong. They use the name to bastardize the technique to make their case, make their claim." When asked to respond to other uses of "time impact analysis" in the industry, applicant's executive vice president, Mr. McKay, said that "when a competitor says he has performed a time impact analysis, he means analysis of the time effect of some condition or activity or event, and that is different and separate from its cost impact or some other impact. It doesn't mean that

he has used the same methodology that we would use and given it the same name." While maintaining that the term is a source identifier of services emanating from applicant, Mr. McKay added that "[o]ther businesses in our line of work do time impact analysis in the sense of the effect upon project completion of an event or set of circumstances. They characterize that as a time impact but it is not Time Impact Analysis...I have seen other types of analysis than what I just described submitted or incorporated into reports prepared by other experts and identified as time impact analysis but they used a different methodology. They used the same name, they use the same identify term [sic], but it is not Time Impact Analysis as we developed the procedure and as we apply it."[9]

The term "Time Impact Analysis" clearly is generic for the category of services listed in applicant's recitation. It names a type or kind of service, and the relevant public, including sophisticated attorneys, contractors and engineers in the construction field, would perceive the term as generic. The fact that the term often appears in print in

---

[9] The comments of Messrs. McCue and McKay are not persuasive. Although applicant asserts that it "is not looking to obtain a trademark registration for any methodologies used...but rather for the name of [applicant's] specialized services," one cannot avoid genericness because there are minor differences in the way that one's product or service differs from the norm, or from those of others. That is to say, while applicant's "specialized" services may be slightly different from the services of competitors, the name of the category of applicant's services is still "time impact analysis."

19

initial capital letters, that is, "Time Impact Analysis," does not compel a different result.

## TIA

The fact that the term "time impact analysis" is generic does not, however, end the inquiry in this case. That is to say, it does not necessarily follow that the initial letters of the generic term are recognized as being substantially synonymous with "time impact analysis." Whether the initials for this generic term should also be deemed generic presents a separate, yet related issue.  In determining this issue, we must examine whether the letters "TIA" are generally recognized and used in the construction field as an accepted abbreviation for "time impact analysis."

An abbreviation or initialism of a generic name which still conveys to the relevant public the original generic connotation of the abbreviated name is still generic. Acronyms and initialisms are often used interchangeably with the full generic name and recognized as equivalent.  The predecessor to our primary reviewing court had occasion to deal with this issue in the case of Modern Optics, Inc. v. Univis Lens Co., 234 F.2d 504, 110 USPQ 293 (CCPA 1956).  In that case, involving the registration of the letters CV as a trademark for ophthalmic lens blanks, the Court stated:

> The letters "CV" are, of course, the
> initial letters of the words "continuous

20

vision," and it is possible for initial letters to become so associated with descriptive words as to become descriptive themselves.  [citations omitted]  It does not follow, however, that all initials or combinations of descriptive words are ipso facto unregistrable.  While each case must be determined on the basis of the particular facts involved, it would seem that, as a general rule, initials cannot be considered descriptive unless they have become so generally understood as representing descriptive words as to be accepted as substantially synonymous therewith.

Id. at 295.  See also, e.g., Southwire Co. v. Kaiser Aluminum 7 Chemical Corp., 196 USPQ 566 (TTAB 1977); and Intel Corp. v. Radiation Inc., 184 USPQ 54 (TTAB 1974).  See generally:  J.T. McCarthy, McCarthy on Trademarks and Unfair Competition, §12:37 (4th ed. 2001).

We thus turn to examine the uses of "TIA" revealed by the record.  Numerous examples of such uses have been introduced, and a representative sample appears below.

WHI's current Time Impact Analysis (TIA) concludes that cell partitions are causing critical path delays to Substantial Completion of the Project. (Time Impact Analysis (TIA) re Cell Partitions and Security Windows on Federal Detention Center Brooklyn, New York for Morganti/Trataros, Joint Venture, November 6, 1996)

To assess the delays that caused and otherwise contributed to the untimely completion of the PAX, [opposer] undertook a series of Time Impact Analyses (TIA).  The TIA is a schedule analysis technique that allows the

21

assessment of delay in a manner that closely proximates the actual progress of the work...As of TIA #1, 6 May 1996, Angelini had lost 52 days along the critical path of the plan...Angelini's contemporaneous schedule update with data date 30 June 1996 is most current with the status date of TIA #2...despite a one and a half month delay to the critical path of the project during the period of TIA #3...
(Schedule Analysis re Mobility Passenger Processing Center, Dover Air Force Base (December 1999))

The schedule analysis for a particular time period is referred to in this REA as a Time Impact Analysis (TIA). The TIAs were performed in chronological order, at significant dates during contract performance. Each TIA includes an as-built schedule from the status date forward based on AEL's contemporaneous planned schedule. Each TIA schedule was compared with the summary as-planned schedule, and with the previous TIA, in order to determine controlling and noncontrolling delays, and concurrency among these delays.
(ECM Aircraft Electronic Combat Trainer, AEL Industries, Inc.'s Request for Equitable Adjustment, May 9, 1995)

Time Impact Analysis (TIA) is a schedule analysis technique designed to identify and quantify schedule impacts contemporaneously through an analysis of the status of the project at certain critical points during the course of construction.
(Schedule and Damages Analysis in Construction Contract Disputes, CLE International, (The Holloway Consulting Group, LLC, September 1997) at www.hollowayllc.com)

Project Management, CPM Schedule Analysis, Cost Evaluation, TIA Time Impact Analysis Claims & Negotiation Preparation

22

(Jacobs Consultant Services website
accessed at www.firms.findlaw.com)

Time Impact Analysis shall be used by
the Contracting Officer in determining
if a time extension or reduction to the
contract milestone date(s) is
justified...Each TIA shall include...
(Department of the Navy, General
Requirements, Network Analysis Schedules
September 30, 2000))

Contractors shall be required to provide
an accurate Time Impact Analysis (TIA)
using the CPM schedule to justify any
time adjustment.  It is imperative that
the CPM provision is enforced for any
contractor request by requiring a
TIA...the TIA shall be contractor-
submitted and engineer-accepted.
(Construction Program Procedure
Bulletin, State of California Department
of Transportation (January 2001))

The Revised Quantum claim was based on a
Time Impact Analysis ("TIA")...it
submitted its TIA on October 9, 1998, to
the CO, and "[t]hat TIA qualified and
revised the number of impacted days the
Brero was claiming against the
Respondent."
(Brero Construction, Inc., U.S.
Department of Labor Board of Contract
Appeals (March 29, 2000))

The time impact analysis (TIA) was
developed to enable the parties to
assess a contractor's right to receive a
time extension in a real-time manner and
to provide the ability for the parties
to resolve disputes prior to an
exhaustive after-the-fact analysis
reconstructed upon completion of the
project...The TIA is a chronological and
cumulative method to analyze delay...The
TIA has been widely accepted and has
significant merit.
(Jon M. Wickwire and Stuart Ockman, Use
of Critical Path Method on Contract

23

> Claims--2000, <u>The Construction Lawyer</u>,
> (October 1999))
>
> Time Impact Analysis (TIA)—Approach—
> Advantages—Disadvantages—Case Studies
> CPM Scheduling:  Changes and Dispute
> Resolution
> (<u>www.fedpubseminars.com</u>)
>
> Each request for a time extension based
> on claimed delays or changed work was to
> be accompanied by a time impact analysis
> (TIA), based upon the date or dates when
> changes were issued or delays
> began...With respect to the TIAs, the
> contract explicitly requires...
> (Board of Contract Appeals, General
> Services Administration, SAE/Americon--
> Mid Atlantic, Inc. v. General Services
> Administration, (October 23, 1998))

The record also includes excerpts from a manual and a print-out version of a Power Point presentation for the "Student's Training Manual" in Advanced Schedule Training prepared for the Naval Facilities Engineering Command in July 2001.  The manual includes the following statements: "The Contractor shall submit a Time Impact Analysis (TIA) illustrating the influence of each change or delay on the Contract Completion Date or milestones...Each TIA shall include a Fragmentary Network (fragnet) demonstrating how the Contractor proposes to incorporate the impact into the Project Schedule."  The Power Point presentation indicates that "Time Impact Analysis" is a widely recognized and accepted technique to demonstrate the effects of a specific delay on a project schedule.  Beginning with the seventh slide of the presentation until the conclusion, just the

initialism "TIA" is used, as for example, "TIAs work most effectively if regular schedule updates are performed."

Also of record is a purported expert report and cover letter (D'Onofrio dep., Ex. No. 25). The report was prepared in connection with other litigation, by an individual not associated with either of the two parties herein. Jay Pandya asserts, in the cover letter to opposer dated January 23, 2001, that he has been using the terminology "Time Impact Analysis" and "TIA" since 1980. The September 27, 1995 report, prepared in connection with claims submitted on a Lake Michigan filtration plant, is replete with references to both "Time Impact Analysis" and "TIA."

The above uses are consistent: in many printed publications, papers and the like, the first use of this specific type of scheduling technique is identified by the designation "Time Impact Analysis (TIA)." Subsequent uses within the same article or paper are of "TIA." Mr. D'Onofrio testified that "[a]s I do with many technical terms, the first time I write it, such as time impact analysis, in order to not keep repeating time impact analysis throughout the paper or report, I would put an acronym for that, and the common acronym associated with time impact analysis is TIA. So I would use it by putting TIA in parenthesis after the first time I used time impact

25

analysis and throughout the rest of the report I would use TIA in place of time impact analysis.  I also think that is how it is commonly used in the industry..."  Mr. D'Onofrio also stated the obvious, that it is just easier to write out "TIA" and say "TIA" in oral presentations.  He also indicated that he has provided expert testimony in court cases and that the reports "that I have written and others in our firm have written, contain the term time impact analysis and generally in those reports we have put the acronym TIA in parentheses behind it and used that throughout the report and also on the graphics."  Mr. Wheatley seconded this view when he stated:  "It is common practice in writing articles to use acronyms or abbreviations for terms in such a way that the term is just introduced with the acronym in parenthesis after it and then the acronym is used thereafter."  Further, Mr. D'Onofrio stated that "we don't distinguish between the long and the short version."  See:  In re Abcor Development Corp., 588 F.2d 811, 200 USPQ 215, 219 (CCPA 1978)[Rich, J., concurring, noting that "the users of language have a universal habit of shortening full names--from haste or laziness or just economy of words."].

The Seventh Circuit, in finding that "L.A." was a descriptive abbreviation for the descriptive words "low alcohol," made the following observation:

> It is possible, although not likely, that the public might become acquainted with initials used in connection with a product without ever being aware that the initials were derived from, and stood for, a descriptive phrase or generic name. This is conceivable, though rather improbable, because the connection between the initials and the descriptive words is in normal course very likely to become known. The process of identifying initials with the set of descriptive words from which they are derived is, after all, usually fairly simple. Ordinarily, no flight of imagination or keen logical insight is required. There is a natural assumption that initials do generally stand for something. All that needs to be done is to convert the next-to-obvious to the obvious by answering the inevitable question: What do the initials stand for? [citations omitted] As a rule, no very extensive or complicated process of education or indoctrination is required to convey that initials stand for descriptive words...[T]here is a heavy burden of a trademark claimant seeking to show an independent meaning of initials apart from the descriptive words which are their source...[A]s a practical matter, initials do not usually differ significantly in their trademark role from the descriptive words that they represent.

G. Heileman Brewing Co. v. Anheuser-Busch, Inc., 873 F.2d 985, 10 USPQ2d 1801, 1808-09 (7th Cir. 1989).

As noted above, we have accepted Mr. Driscoll as an expert in schedule analysis in the construction management field. When he was asked who coined the term "Time Impact Analysis," he responded "You're probably looking at him, but I'm not going to claim it." Throughout his testimony, Mr.

27

Driscoll reiterated his view that "Time Impact Analysis" and "TIA" are widely used industry terms--"[i]t is just so routine in the industry." Although Mr. Driscoll indicated that he uses the full term "Time Impact Analysis" in his writings, "[t]o me, TIA is Time Impact Analysis. I refer to it all the time. If you were in my classes, you would know what it is real quick." At one point, Mr. Driscoll stated: "To me TIA is Time Impact Analysis; they are interchangeable as far as I am concerned." Mr. Cosinuke, with long-time experience in the field, weighed in with the same view, and indicated that the letters "TIA" connote "Time Impact Analysis."

Mr. McCue, while maintaining that both designations are proprietary to applicant, also responded "[p]ossibly" to the question whether he considered "Time Impact Analysis" and "TIA" to be interchangeable. When asked if "TIA" ever meant "Time Impact Analysis," he responded "[i]t may." He went on to indicate that "sometimes on our schedule graphics we would use shorthand notations when we are doing a series of analyses and when we may put TIA in those cases rather than using the words Time Impact Analysis #1 or #2." Mr. McKay, another of applicant's officers, indicated that "TIA" stands for "Time Impact Analysis" when used "in the context of schedule analysis" and when asked if the terms were interchangeable, Mr. McKay answered "[I]n the same context I

28

would say so."  Mr. McKay also noted that "the term TIA in the context of construction schedule analysis frequently refers to Time Impact Analysis, but I would not say that is exclusive."  When asked what other meanings TIA might have in the field, Mr. McKay responded "I have no idea."

The record also shows an almost complete failure on applicant's part, in the face of generic uses of "TIA" by others in the field, to police its purported rights in the designation "TIA."  See, e.g., King-Seeley Thermos Co. v. Aladdin Industries, Inc., 321 F.2d 577, 138 USPQ 349, 350-51 (2d Cir. 1963).

Based on the extensive record in this case, we conclude that the initialism "TIA" has become so generally understood as representing the generic term "time impact analysis" as to be accepted as substantially synonymous therewith.

In so finding, we recognize that the only uses of "TIA" per se in printed materials are after an initial use of "Time Impact Analysis (TIA)," but we do not believe that this fact warrants a finding that the initials themselves are registrable.  The size of the relevant public herein is relatively small, owing to the highly sophisticated nature of the services.  Purchasers of such services, for example, attorneys, contractors, engineers and the like, already are quite knowledgeable in what they are seeking.  We have no doubt that "no flight or imagination or keen logical insight

29

is required" of them in perceiving that the initials "TIA" are the generic equivalent of the term "time impact analysis." See: G. Heileman Brewing Co. v. Anheuser-Busch, Inc., supra at 1808. Likewise, boards of contract appeals and others presented with "TIA" reports would immediately understand the nature of the report. Given the interchangeability of the letters and the term, the initialism "TIA" will be perceived as the equivalent of the generic term "time impact analysis."

We conclude that "TIA" has been used by opposer and others in or associated with the construction industry as the generic initialism for the scheduling technique known as "time impact analysis." As such, it has fallen into the lexicon of the language utilized in this field serving to name a particular type or kind of schedule analysis rather than a service emanating from a single source of such services.

## Asset Purchase Agreement

In support of its argument against the claim of genericness, applicant has relied upon an asset purchase agreement wherein, according to applicant, it purchased proprietary rights in the involved mark from a third party. Applicant contends that competitors and customers "attribute TIA to applicant, and no one else" and that "MDC, through its lineage of companies both under the MDC name and others,

30

but through the same core of people and corporate assets, is closely associated in the minds of others within this specialty field by its TIA mark."

Applicant claims to have obtained the trademark rights to "TIA" from a predecessor in interest, namely Day & Zimmerman International, Inc. (D&Z). According to applicant, it purchased from D&Z all intellectual property rights relating to D&Z's construction claims business with the exception of certain D&Z marks identified in the asset purchase agreement between applicant and D&Z. Mr. McCue, applicant's president, maintains that he and a deceased employee of D&Z are the only persons who would be aware of the intentions of the parties to the agreement. Applicant argues: "While D&Z did not file any applications to federally register TIA or other marks, the fact that D&Z did not object to any trademark applications filed by Applicant after Applicant purchased the assets of MDC from D&Z, tells us that the marks were indeed transferred as part of the intangible intellectual property acquired by Applicant." (brief, p. 15). Of record is a copy of the February 24, 1997 Asset Purchase Agreement.[10] The agreement refers to transfer of the trade names "MDC" and "MDC Systems," but the agreement makes no mention of the designations "TIA" or

---

[10] Although the agreement has been filed under seal, we see no harm in disclosing the provisions specifically referred to in this decision.

31

"Time Impact Analysis."  Paragraph 15.0 of the agreement

provides as follows:

> ENTIRE AGREEMENT.  This Agreement sets
> forth the entire understanding of the
> parties hereto with respect to the
> transactions contemplated hereby.  It
> shall not be amended or modified except
> by written instrument duly executed by
> each of the parties hereto.  Any and all
> previous agreements and understandings
> between or among the parties regarding
> the subject matter thereof, whether
> written or oral, are superseded by this
> Agreement.

Annex 1 to the agreement is captioned "Definitions," and one

of the listed definitions is "Assigned Tradename."  The term

is defined as follows:  "'MDC', 'MDC Systems', logos

including these names, and variants thereof.  The tradenames

'Day', 'Day & Zimmerman', 'D&Z', 'Yoh', logos including

these names and variants thereof are expressly excluded from

any assignment of tradenames, trademarks or other

intellectual property made under the Agreement."

Also of record is the testimony of James Goodman,

president and general counsel of D&Z, who appeared pursuant

to subpoena.  Although Mr. Goodman indicated that he had no

personal involvement in or knowledge of the negotiations

leading to the agreement, he reiterated that the agreement

made no mention of either "TIA" or "Time Impact Analysis."

In an e-mail exchange with applicant, introduced as an

exhibit to his testimony, he again stated that the subject

32

designation "TIA" was not included in the agreement.  Mr. Goodman also testified that his view was based on a review of the agreement and other documents in a file relating to the agreement, and a "discussion I had with the attorney in my department who was directly involved in the transaction."

In a letter dated March 13, 2002 from Mr. McCue to Harold Yoh, D&Z's president, Mr. McCue essentially requested Mr. Yoh to confirm that rights to designations such as "TIA" and "Time Impact Analysis" were transferred to applicant. Mr. McCue wrote:  "In fact, during the negotiations between myself, on behalf of [applicant], and Barry Beuchner [the now deceased employee of D&Z], on behalf of the Day & Zimmerman conglomerate, it was made clear that [applicant] purchased all of the intellectual property of the claims unit, but so that there was no misconceptions or misinterpretations, the D&Z marks were specifically identified in the parties' Asset Purchase Agreement as not being sold to [applicant] because this language in the agreement prepared by Day & Zimmerman conglomerate was so broad that it could be misinterpreted by third parties to include the D&Z marks."  Mr. McCue goes on to request Mr. Yoh to confirm that D&Z does not reserve any rights in "TIA" or "Time Impact Analysis."  Upon such confirmation, Mr. McCue writes that "we will gladly release the remaining funds and complete the payment for these assets."

33

What is somewhat unusual about Mr. McCue's request is that applicant's payments pursuant to the agreement already were past due (see D&Z's letter dated February 15, 2002). Mr. Goodman responded in a letter dated March 28, 2003 which reads, in part, as follows:

> The approach you have taken in your letter constitutes extreme bad faith on your part. You are in possession of funds owed in connection with the MDC asset purchase that are more than one year overdue, and you are now holding them hostage for a document that you apparently intend to use to support your position in litigation before the U.S. Patent and Trademark Office's Trademark Trial and Appeal Board--litigation in which Day & Zimmerman is not a party.

The Asset Purchase Agreement dated February 24, 1997 speaks for itself: it did not cover transfer of rights, if any, to the designations "TIA" or "time impact analysis." The fact that any such rights were not conveyed comes as no surprise inasmuch as it is apparent that D&Z never claimed proprietary rights in either designation. Employees (both former and current) of D&Z who testified in this case indicate that D&Z never claimed exclusive rights in the term. Even James McKay, applicant's executive vice president (and a former employee of D&Z), when asked if D&Z ever claimed that "time impact analysis" or "TIA" were proprietary terms, replied "not to my knowledge." There is neither testimony nor a single exhibit which suggests that

D&Z ever claimed exclusive rights in "TIA" or "time impact analysis," and, thus, that D&Z was conveying any proprietary rights in the designations.

We would point out that, in any event, even if D&Z had claimed proprietary rights in "TIA," and even if the agreement had conveyed such purported rights to applicant, this would not be dispositive or even particularly probative evidence on the genericness issue. Whatever the intention of applicant and the assignee may have been regarding whether "TIA" is a trademark, that fact simply does control our analysis. We must assess the meaning of "TIA" to the relevant public, regardless of how D&Z and applicant may have treated "TIA" in their dealings with each other.

## Additional Arguments

Applicant's recent registration of the mark TIME IN ACTION for "consulting services in the field of construction management; arbitration, alternative dispute resolution and litigation support services; consulting services in the field of arbitration, alternative dispute resolution and litigation support services; consulting services in the field of construction project problem solutions which analyzes the effect of a particular event on scheduled activities"[11] is not persuasive of a different result.

---

[11] Application Serial No. 76/295,830, filed August 6, 2001, alleging a bona fide intention to use the mark in commerce. The

Applicant essentially argues that the designation "TIA" may also be an initialism for this mark.

A few comments are in order. First, the underlying application was not filed until seven months after commencement of this proceeding. When Mr. McKay was asked in October 2001 "What is Time in Action?", he responded: "It sounds to me like some sort of procedure or process; I don't know, I'm not familiar with the term." Simply put, it is not likely that prospective purchasers would perceive "TIA" as an initialism for TIME IN ACTION rather than "time impact analysis." Given the particular circumstances and timing of the filing, it is disingenuous to suggest otherwise.

Applicant argues that the letters "TIA" have other meanings in other fields, as for example, "transient ischemic attack" in the medical field. Suffice it to say, the issue must be determined in the context of the specific field in which applicant's services are rendered. These other meanings are irrelevant when determining the genericness of the letters when used in connection with applicant's specific services. When Mr. Wheatley was asked whether TIA ever gets used in connection with any phrase other than "Time Impact Analysis" in the construction

application matured into Registration No. 2,676,834 on January 21, 2003, setting forth dates of first use of October 30, 2000.

industry, he answered "not that I can recall."

## Mere Descriptiveness Analysis

In the event that the designation TIA ultimately is found to be not generic, we turn to address the question of mere descriptiveness. No claim of acquired distinctiveness under Section 2(f) has been raised in this case by applicant and, in response to the Board's questioning at the oral hearing, applicant acknowledged this point. Specifically, counsel acknowledged that if the matter sought to be registered were found to be merely descriptive, then no registration would issue based on the involved application.

A mark is merely descriptive if, as used in connection with the goods and/or services, it describes, i.e., immediately conveys information about, an ingredient, quality, characteristic, feature, etc. thereof, or if it directly conveys information regarding the nature, function, purpose, or use of the goods and/or services. See: In re Abcor Development Corp., supra; In re Eden Foods Inc., 24 USPQ2d 1757 (TTAB 1992); and In re American Screen Process Equipment Co., 175 USPQ 561 (TTAB 1972). The issue is not determined in a vacuum, but rather the mere descriptiveness of the mark is analyzed as the mark is used in connection with the goods and/or services. An abbreviation of a descriptive term which still conveys to the buyer the descriptive connotation of the original term will still be

37

held to be descriptive.  Spin Physics, Inc. v. Matsushita Electric Industrial Co., 168 USPQ 605 (TTAB 1970).

We find that the testimony and evidence establishes that the designation TIA is, at a minimum, merely descriptive when used in connection with applicant's services.  Given the interchangeability of "TIA" and "time impact analysis," the letters immediately and directly convey information about applicant's services, that is, that the services involve time impact analysis.

## Decision

The opposition is sustained, and registration to applicant is refused.